

**Notice of Service of Process**

<div align="right">

**null / ALL**
**Transmittal Number: 31683101**
**Date Processed: 06/23/2025**

</div>

| | |
|---|---|
| **Primary Contact:** | William P Wodjak<br>Columbia Debt Recovery, LLC<br>906 SE Everett Mall Way<br>Ste 301<br>Everett, WA 98208-3744 |

| | |
|---|---|
| **Entity:** | Columbia Debt Recovery, LLC<br>Entity ID Number 3900695 |
| **Entity Served:** | Columbia Debt Recovery, LLC |
| **Title of Action:** | Megan Hamilton vs. Columbia Debt Recovery, LLC |
| **Matter Name/ID:** | Megan Hamilton vs. Columbia Debt Recovery, LLC (17502079) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | King County Superior Court, WA |
| **Case/Reference No:** | Not Shown |
| **Jurisdiction Served:** | Washington |
| **Date Served on CSC:** | 06/20/2025 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Anderson Santiago, PLLC<br>206-395-2665 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF WASHINGTON
IN AND FOR KING COUNTY

8

9

MEGAN HAMILTON,

Plaintiff,

NO.

vs.

SUMMONS

10

11

COLUMBIA DEBT RECOVERY, LLC,

12

Defendant.

13

14

**TO THE DEFENDANT:** COLUMBIA DEBT RECOVERY, LLC

15

A lawsuit has been started against you in the above-entitled court by the Plaintiff. This claim

16

is stated in the written Complaint, a copy of which is served upon you with this Summons.

17

In order to defend against this lawsuit, you must respond to the Complaint by stating your

18

defense in writing, and by serving a copy upon the person signing this Summons within twenty (20)

19

days (in state) or sixty (60) days (out of state) after the service of this Summons, excluding the day of

20

service, or a default judgment may be entered against you without notice. A default judgment is one

21

where a plaintiff is entitled to what has been asked for because you have not responded. If you serve

22

a notice of appearance on the undersigned person, you are entitled to a notice before a default

23

judgment may be entered.

Summons - 1

**ANDERSON | SANTIAGO**
207B Sunset Blvd N.
Renton, WA 98057
(206) 395-2665/F (206) 395-2719

1   If you wish to seek the advice of an attorney on this matter, you should do so promptly so that

2   your written response, if any, may be served on time.

3      **THIS SUMMONS** is issued pursuant to Rule 4 of the Superior Court Civil Rules of the

4   State of Washington.

5

6      Respectfully submitted this 19th day of June, 2025.

7

8                                    **ANDERSON SANTIAGO, PLLC**

9
      By:_____
10    Jason D. Anderson, WSBA No. 38014
      T. Tyler Santiago, WSBA No. 46004
      Attorneys for Plaintiff
11    207B Sunset Blvd. N.
      Renton, WA 98057
12    (206) 395-2665
      (206) 395-2719 (fax)
13

14

15

16

17

18

19

20

21

22

23

Summons - 2

1

2

3

4

5

6

7

8

IN THE SUPERIOR COURT OF WASHINGTON
IN AND FOR KING COUNTY

9  MEGAN HAMILTON,

NO.

10              Plaintiff,

**COMPLAINT FOR VIOLATIONS OF 15 U.S.C. § 1692 ET SEQ. AND RCW CHAPTERS 19.16 AND 19.86 ET SEQ.**

11      vs.

12  COLUMBIA DEBT RECOVERY, LLC,

13              Defendant.

14

15      COMES NOW Plaintiff, by and through counsel, who alleges:

16              I.      **PARTIES AND JURISDICTION**

17      1.      Plaintiff Megan Hamilton is an individual who resides in Washington State.

18      2.      Defendant Columbia Debt Recovery, LLC ("CDR"), a Washington Limited

19  Liability, UBI # 604 074 740, is a debt collector and licensed collection agency doing business in

20  Washington, and who repeatedly attempted to collect an alleged debt from the Plaintiff.  CDR's

21  registered agent is Corporation Service Company, 300 Deschutes Way SW Ste 208 MC-CSC1,

22  Tumwater, WA, 98501.

23      3.      Jurisdiction over Defendant is proper as Defendant does business in Washington

Complaint - 1

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

1    State, including King County, and venue is statutorily appropriate in King County, Washington.

2    <center>**II.    FACTS**</center>

3        4.    In June 2023, Plaintiff Megan Hamilton leased an apartment in Fife, WA from

4    Pinnacle Apartments ("the landlord").  The lease was for one year and seven days, ending on

5    June 30, 2024.

6        5.    Pursuant to the terms of the lease, twenty days' notice was required prior to

7    move-out.  This is consistent with RCW 59.18.220(2).

8        6.    As her lease was coming to an end, Ms. Hamilton found a different place to rent,

9    and on June 7, 2024 provided notice to the landlord that she would be moving out by the 28th of

10   June.  Thus, Ms. Hamilton provided well over twenty days' notice – prior to the expiration of the

11   lease - to the landlord prior to moving out.

12       7.    Ms. Hamilton physically moved out of the apartment well before June 28th.

13   Upon leaving, she let the landlord know that the keys had been dropped off, and the landlord

14   confirmed receipt on June 24th.

15       8.    Since she had given notice, had received confirmation that the keys had been

16   turned-in, and she had moved out, Ms. Hamilton assumed that her relationship with the landlord

17   was nearly complete.  The only thing remaining was that she would receive her deposit (minus

18   any minor deductions) via mail.  However, Ms. Hamilton received nothing and heard nothing

19   further about the lease for nearly a year.

20   <center>**Ms. Hamilton Receives a Collection E-mail From CDR**</center>

21       9.    On May 6, 2025, out of the blue, Ms. Hamilton received an e-mail from CDR

22   claiming that she owed $1,231.97 for a debt alleged to be owed to Pinnacle Apartments.  A copy

23   of the e-mail is attached as **Exhibit A**.

Complaint - 2

**ANDERSON | SANTIAGO**
207B Sunset Blvd N.
Renton, WA 98057
(206) 395-2665/F (206) 395-2719

10.     In addition to the principal amount, CDR claimed that she owed $55.28 in interest.

11.     Ms. Hamilton was shocked and extremely confused.  She had given proper notice, moved out in a timely manner, and even had confirmation that the keys had been turned-in prior to the expiration of the lease.  She could not understand why she would owe money.

12.     In response to the letter, Ms. Hamilton called CDR to understand why it was attempting to collect money from her.  During the call, she was told that the amounts owed were for rent for June and/or August of 2024.

13.     This, of course, did not make sense, as she had moved out mid-June shortly before the lease expiration.

14.     On or about May 17, 2025, Ms. Hamilton mailed a letter to CDR, informing it that she had given ample notice that she was moving out.  She also informed CDR that she had received confirmation that the landlord it had received the keys prior to the lease expiration.

15.     She asked CDR to stop contacting her in an attempt to collect money, and to confirm that she did not owe a debt.  CDR's response was even more confusing than its initial collection letter.

### CDR Doubles Down and Demands Even More Money

16.     On May 21, 2025, CDR responded to Ms. Hamilton's letter by again demanding that she pay.  A copy of the letter is attached as **Exhibit B**.  Additionally, CDR claimed that Ms. Hamilton owed even more money due to the addition of interest.

17.     Adding to the confusion was CDR's inclusion of a "summary of move out charges."  The summary claimed that Ms. Hamilton had moved out on August 23, 2024, that she owed "rent" in the amount of $695.97, $191.00 in "damage/repairs," a late fee of $300.00, and a

Complaint - 3

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

1  Nowhere in the summary was any mention of her $250.00 deposit.

2      18.    The summary made absolutely no sense for a variety of reasons.  First, she moved

3  out and turned in her keys in June, so the August move-out date was false.  Second, she was

4  assessed a late fee for no reason as she had never been late on her rent payments.  Finally, the

5  amount of rent allegedly owed did not match up to nearly two months of rent beyond the lease

6  end.

7      19.    Ms. Hamilton was astounded, and unsure of what to do.  Making matters worse,

8  she discovered that CDR was reporting the alleged debt to her credit, and had been doing so for

9  over six months.

10      20.    Since CDR refused to resolve or investigate the issue, Ms. Hamilton had no

11  choice but to seek out and retain counsel.

12      21.    As a result of Defendant's actions detailed above, Plaintiff has incurred expenses

13  in seeking and retaining counsel in connection with ascertaining her legal rights and

14  responsibilities, and has suffered financial uncertainty, unease, and distress caused by

15  Defendant's tactics and communications, which are false, misleading, improper, and/or

16  confusing.

17  ### III.    CAUSES OF ACTION

18  **GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

19      22.    With respect to the alleged debt, Plaintiff is a consumer as defined by 15 U.S.C. §

20  1692a(3) and Defendant is a debt collector as defined by 15 U.S.C. § 1692a(6).

21      23.    With respect to the alleged debt, Plaintiff is a "debtor" as defined by RCW

22  19.16.100(8) and Defendant is a collection agency as defined by RCW 19.16.100(4).

23      24.    For claims arising under the Fair Debt Collection Practices Act, such claims are

Complaint - 4

**ANDERSON|SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

assessed using the "least sophisticated debtor" standard. *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007).

### Count 1

25.     A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. 15 U.S.C. § 1692e. Additionally, it is a violation to falsely represent the character, amount, or legal status of any debt. § 1692e(2); *see also* § 1692e(10) (further prohibiting false representations and/or deceptive activities).

26.     Plaintiff incorporates the above paragraphs and realleges them herein.

27.     CDR attempted to collect money that was not via email, via phone, and via letter as Ms. Hamilton did not owe a debt.

28.     CDR also inflated the balance by calculating interest on top of a debt not owed.

29.     Therefore, Defendant CDR violated 15 U.S.C. § 1692e and/or § 1692e(2)/e(10).

### Count 2

30.     A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. 15 U.S.C. § 1692f.

31.     Plaintiff realleges the allegations in Count 1, *supra*.

32.     The actions of CDR also constitute unfair or unconscionable means to collect or attempt to collect a debt.

33.     For the above-stated reasons, Defendant CDR therefore violated 15 U.S.C. § 1692f on multiple occasions.

### GENERAL ALLEGATIONS APPLICABLE TO ALL CPA CLAIMS

34.     Violations of RCW 19.16.250 are per se violations of the Consumer Protection

Complaint - 5

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

Act ("CPA"), RCW chapter 19.86.[1]  *See* RCW 19.16.440.  RCW 19.86.090 provides for treble damages (to a limit of $25,000) and attorney's fees.

35.    Because RCW Chapter 19.16 is enforced through RCW 19.86 *et seq.*, the below counts alleging violations of RCW Chapter 19.16 are therefore CPA violations.

36.    Even minimal or nominal damages constitute "injury" under the CPA.  *Panag*, 166 Wn.2d at 57.  A plaintiff need not prove any monetary damages at all, as even "unquantifiable damages" suffice to establish "injury" for purposes of the CPA.  *Id.* (citing *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 740 (1987)).

37.    Lastly, FDCPA violations separately constitute "per se" violations of the CPA. (For ease of reference, Plaintiff will not reallege each claim multiple times.  Nevertheless, this is yet another basis for CPA liability.)

### Count 3

38.    A collection agency may not collect or attempt to collect any sum other than principal, allowable interest, collection costs or handling fees expressly authorized by statute, and in the case of suit attorney's fees and taxable court costs.  RCW 19.16.250(21).

39.    Here, Defendant CDR attempted to collect amounts which were not owed (including a principal not owed and interest calculated thereon) and not authorized by law via email, letter, and phone call.

40.    Defendant CDR therefore violated RCW 19.16.250(21).

### Count 4 – Additonal "per se" CPA claims

41.    Defendant's violations of the FDCPA as outlined above – regardless of whether

---

[1] *See Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 53 (2009) ("Consumer debt collection is a highly regulated field.  When a violation of debt collection regulations occurs, it constitutes a per se violation of the CPA...").

Complaint - 6

ANDERSON | SANTIAGO
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

such claims would otherwise be purportedly time-barred (and/or subject to equitable doctrines) –

themselves constitute *per se* violations of the CPA. *See Sims v. Midland Funding LLC*, 2021 WL

1546135 at *5 (W.D. Wash. Apr. 20, 2021) (citing *Hoffman v. Transworld Sys. Inc.*, 806 F. App'x

549, 552 n.3 (9th Cir. 2020)).

42.    Washington's CPA claims are subject to the discovery rule.  *See Shepard v.*

*Holmes*, 185 Wn. App. 730, 740 (2014).

43.    Therefore, each of the foregoing FDCPA claims are reasserted herein as "per se"

violations of the CPA, and Defendant CDR thus violated the Consumer Protection Act on

numerous occasions on this independent basis.

**Request for Injunctive Relief**

44.    A plaintiff may seek injunctive relief for violations of the Consumer Protection

Act.  RCW 19.86.090.

45.    Plaintiff does seek injunctive relief from this Court which would enjoin

Defendant from collecting debts in the manner described above from both Plaintiff and any other

person similarly situated.  *Scott v. Cingular Wireless*, 160 Wn. 2d 843, 853 (2007).

46.    Specifically, Plaintiff seeks an injunction prohibiting Defendant CDR from

collecting amounts not owed and assessing interest on top of those amounts, among other tactics.

47.    Plaintiff has reason to believe these actions make up a pattern and practice of

behavior and have impacted other individuals similarly situated.

48.    Injunctive relief is necessary to prevent further injury to Plaintiff and to the

Washington public as a whole.

49.    Injunctive relief should therefore issue as described herein.

**IV.  PRAYER FOR RELIEF**

Complaint - 7

**ANDERSON | SANTIAGO**
207B SUNSET BLVD N.
RENTON, WA 98057
(206) 395-2665/F (206) 395-2719

WHEREFORE, Plaintiff prays:

1.     For Judgment against Defendant for actual damages.

2.     For statutory damages of $1,000.00 for FDCPA violations, per Plaintiff.

3.     For statutory damages of $7,500.00 per violation for Washington Collection Agency Act and Consumer Protection Act violations, per Defendant.

4.     For treble damages, pursuant to RCW 19.86.090, calculated from the damages determined by the court.

5.     For costs and reasonable attorney's fees as determined by the Court pursuant to 15 U.S.C. 1692k(a)(3) and other applicable law.

6.     For injunctive relief pursuant to RCW 19.86.090 as described above.

Respectfully submitted this 19th day of June, 2025.

**ANDERSON SANTIAGO, PLLC**

By:

Jason D. Anderson, WSBA No. 38014
T. Tyler Santiago, WSBA No. 46004
Attorneys for Plaintiff
207B Sunset Blvd. N.
Renton, WA 98057
(206) 395-2665
(206) 395-2719 (fax)

Complaint - 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# EXHIBIT A

On Tuesday, May 6, 2025, Collection Admin <CollectionAdmin@genesiscred.com> wrote:

<div align="center">

COLUMBIA DEBT RECOVERY LLC DBA GENESIS

906 SE EVERETT MALL WAY STE 301 EVERETT, WA 98208-3744

TOLL FREE: 866-863-9194 MONDAY-FRIDAY 8AM TO 5PM PST

</div>

SEND WRITTEN DISPUTES TO: PO BOX 3630 EVERETT, WA 98213-8630

MAY 6, 2025

PRE-Account #:██████8010

HAMILTON,MEGAN JANE

3501 Pacific Hwy E #204

FIFE WA 98424

ORIGINAL CREDITOR: PINNACLE APARTMENTS

PLACED FOR COLLECTIONS ON: 11/05/24

Original Balance: $1231.97

Current Principal: $1231.97

Interest Due: $55.28

Total Due: $1287.25

MEGAN JANE HAMILTON

In reference to your recent request, please find enclosed validation of debt with PINNACLE APARTMENTS

Should you have any further questions, please contact the undersigned below or you may email documentation to Compliance@genesiscred.com for review.

Sincerely,

COLUMBIA DEBT RECOVERY LLC DBA GENESIS

(866) 863-9194

This is a communication from a debt collector. This is an attempt to collect a debt. Any information will be used for that purpose. As of the date of this letter you owe the amount stated above. Your account bears interest at 009.00 percent per annum. Because interest and other charges vary from day to day, please contact us to learn the exact amount you owe as of the date of your payment.

Note: To remove your email from the contact list, please reply "Stop".

Notice: Please see below for important information.

<div align="center">

Columbia Debt Recovery LLC

DBA Genesis

State Disclosures

</div>

TO ALL CONSUMERS – Notice about Electronic Check Conversion: When you provide a

check as payment, you authorize us either to use information from your check to

make a one-time electronic fund transfer from your account or to process the

payment as a check transaction. When we use information from your check to make

an electronic fund transfer, funds may be withdrawn from your account as soon as

the same day we receive your payment and you will not receive your check back

from your financial institution. Also, you authorize us to represent a check as

an electronic fund transfer from your account if your payment is returned unpaid.

Please be aware of the following rights. This list does not contain a complete

list of the rights consumers have under state and federal law.

California Residents:

CALIFORNIA COLLECTIONS LICENSE NUMBER 10771-99.

The state Rosenthal Fair Debt Collection Practices Act,

and the federal Fair Debt Collection Practices Act require that, except under

unusual circumstances, collectors may not contact you before 8 a.m. or after

9 p.m. They may not harass you by using threats of violence or arrest or by using

obscene language. Collectors may not use false or misleading statements or call

you at work if they know or have reason to know that you may not receive personal

calls at work. For the most part, collectors may not tell another person, other

than your attorney or spouse, about your debt. Collectors may contact another

person to confirm your location or enforce a judgment. For more information about

debt collection activities, you may contact the Federal Trade Commission at

1-877-FTC-HELP or http://www.ftc.gov/.

As required by law, you are hereby notified that a negative credit agency report

reflecting on your credit record may be submitted to a credit reporting agency

if you fail to fulfill the terms of your credit obligations.

CALIFORNIA COLLECTIONS LICENSE NUMBER:10771-99

Colorado Residents:

The Colorado office of Columbia Debt Recovery is located at

27 North Willerup, Suite B, Montrose, CO 81401, telephone (970) 249-7514. FOR

INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE

WWW.COAG.GOV/CAR. A consumer has the right to request in writing

that a debt collector or collection agency cease further communication with the

consumer. A written request to cease communication will not prohibit the debt

collector or collection agency from taking any other action authorized by law to

collect the debt.


Minnesota Residents:

This collection agency is licensed by the Minnesota

Department of Commerce.


Maine Residents:

Hours of Operation: M-F 8:00am – 5:00pm PDT; Call toll free

(866) 863-9194.


New York:

Debt collectors, in accordance with the Fair Debt Collection Practices

Act, 15 U.S.C.

§ 1692 et seq., are prohibited from engaging in abusive, deceptive, and unfair

debt collection efforts, including but not limited to: the use or threat of

violence; (ii) the use of obscene or profane language; and (iii) repeated phone

calls made with the intent to annoy, abuse, or harass. If a creditor or debt

collector receives a money judgment against you in court, state and federal

laws

may prevent the following types of income from being taken to pay the debt:1. Supplemental security income, (SSI); 2. Social security; 3. Public assistance (welfare); 4. Spousal support, maintenance (alimony) or child support; 5. Unemployment benefits; 6. Disability benefits; 7. Workers' compensation benefits; 8. Public or private pensions;9. Veterans' benefits; 10. Federal

student loans, federal student grants, and federal work study funds; and11. Ninety percent of your wages or salary earned in the last sixty days.

New York City Borough Residents:

Department of Consumer Affairs, City of

New York, License # 2095802-DCA. Please contact Hayden Hunter at (866) 863-9194

if you have questions. Para un agente de habla hispana, llame al (877)397-9337

Please see https://www1.nyc.gov/site/dca/index.page for a translation of commonly

used debt collection terms in your preferred language.

North Carolina Residents:

North Carolina Department of Insurance Permit

# 119507065

Utah Residents:

As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# EXHIBIT B

COLUMBIA DEBT RECOVERY LLC DBA GENESIS
906 SE EVERETT MALL WAY STE 301 EVERETT, WA 98208-3744
TOLL FREE: 866-863-9194 MONDAY-FRIDAY 8AM TO 5PM PST
SEND WRITTEN DISPUTES TO: PO BOX 3630 EVERETT, WA 98213-8630

MAY 21, 2025

PR1-Account # █████8010

HAMILTON,MEGAN JANE
3010 1ST AVE UNIT 403
SEATTLE WA 98121

ORIGINAL CREDITOR: PINNACLE APARTMENTS
PLACED FOR COLLECTIONS ON: 11/05/24

Original Balance:   $1231.97
Current Principal:  $1231.97
Interest Due:       $59.84
Total Due:          $1291.81

MEGAN JANE HAMILTON

In reference to your recent request, please find enclosed validation of debt
with PINNACLE APARTMENTS

Should you have any further questions, please contact the undersigned below
or you may email documentation to Compliance@genesiscred.com for review.

Sincerely,

COLUMBIA DEBT RECOVERY LLC DBA GENESIS
(866) 863-9194

This is a communication from a debt collector. This is an attempt to collect
a debt. Any information will be used for that purpose. As of the date of this
letter you owe the amount stated above. Your account bears interest at 009.00
percent per annum. Because interest and other charges vary from day to day,
please contact us to learn the exact amount you owe as of the date of your
payment.



**Columbia Debt Recovery LLC DBA Genesis**
**State Disclosures**

**TO ALL CONSUMERS – Notice about Electronic Check Conversion:** When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment and you will not receive your check back from your financial institution. Also, you authorize us to represent a check as an electronic fund transfer from your account if your payment is returned unpaid.

**Please be aware of the following rights.  This list does not contain a complete list of the rights consumers have under state and federal law.**

**California Residents:** The state Rosenthal Fair Debt Collection Practices Act, and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or http://www.ftc.gov/.

As required by law, you are hereby notified that a negative credit agency report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.
CALIFORNIA COLLECTIONS LICENSE NUMBER: 10771-99

**Colorado Residents:** The Colorado office of Columbia Debt Recovery is located at 27 North Willerup, Suite B, Montrose, CO 81401, telephone (970) 249-7514. FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COAG.GOV/CAR. A consumer has the right to request in writing that a debt collector or collection agency cease further communication with the consumer. A written request to cease communication will not prohibit the debt collector or collection agency from taking any other action authorized by law to collect the debt.

**Minnesota Residents:**  This collection agency is licensed by the Minnesota Department of Commerce.

**Maine Residents:** Hours of Operation: M-F 8:00am – 5:00pm PDT; Call toll free (866) 863-9194.

**New York:** Debt collectors, in accordance with the Fair Debt Collection Practices Act, 15 U.S.C.
§ 1692 et seq., are prohibited from engaging in abusive, deceptive, and unfair debt collection efforts, including but not limited to: the use or threat of violence; (ii) the use of obscene or profane language; and (iii) repeated phone calls made with the intent to annoy, abuse, or harass. If a creditor or debt collector receives a money judgment against you in court, state and federal laws may prevent the following types of income from being taken to pay the debt:1. Supplemental security income, (SSI); 2. Social security; 3. Public assistance (welfare); 4. Spousal support, maintenance (alimony) or child support; 5. Unemployment benefits; 6. Disability benefits; 7. Workers' compensation benefits; 8. Public or private pensions;9. Veterans' benefits; 10. Federal student loans, federal student grants, and federal work study funds; and11. Ninety percent of your wages or salary earned in the last sixty days.

**New York City Borough Residents:** Department of Consumer Affairs, City of New York, License # 2095802-DCA. Please contact Hayden Hunter at (866) 863-9194 if you have questions. Para un agente de habla hispana, llame al (877)397-9337 Please see https://www1.nyc.gov/site/dca/index.page for a translation of commonly used debt collection terms in your preferred language.

**North Carolina Residents:** North Carolina Department of Insurance Permit # 119507065 & # 519352683

**Utah Residents:** As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.


Scanned with
CamScanner

## SUMMARY OF MOVE OUT CHARGES

| Residents: | Megan Hamilton |
|---|---|
| Property: | Pinnacle Apartments |
| Unit: | 3501 Pacific Hwy E #204 #204, Fife, WA 98424 |
| Move-Out Date: | August 23, 2024 |

## STATEMENT (ACCOUNT #71777289)

| Charge | Amount |
|---|---|
| Property Damage Liability Waiver | $45.00 |
| Rent | $695.97 |
| Damage/Repairs | $191.00 |
| Late Fee | $300.00 |
| CHARGE TOTAL: | $1,231.97 |



Pinnacle Apartments



# LEASE CONTRACT
### CERTIFIED LEASE — WASHINGTON

## PARTIES AND LEASED PREMISES

| Owner | Address | Phone |
|---|---|---|
| PINNACLE APARTMENTS | 3501 PACIFIC HWY E, Fife, WA  98424 | (425) 339-3638 |

| Residential Community | | |
|---|---|---|
| Pinnacle Apartments | | |

| Street Address | City | State | ZIP |
|---|---|---|---|
| 3501 Pacific Hwy E | Fife | Washington | 98424 |

| Residents | | Leased Premises |
|---|---|---|
| Megan Jane Hamilton | | 204 |

| Street Address | City | State | ZIP |
|---|---|---|---|
| 3501 Pacific Hwy E | Fife | Washington | 98424 |

## LEASE TERM

| Type | Length | Move-In Date | Start Date | End Date | Date Signed |
|---|---|---|---|---|---|
| ☒ Move-In  ☐ Renewal | 1 year and 7 days | 6/24/2023 | 6/24/2023 | 6/30/2024 | June 20, 2023 |

## RENT

| Payable To | Address | Phone |
|---|---|---|
| PINNACLE APARTMENTS | 3501 PACIFIC HWY E, Fife, WA  98424 | (425) 339-3638 |

| Office Hours | Due On | Late On | Fax |
|---|---|---|---|
| 8am to 5pm Monday - Friday | 1st | 6th | ( ) |

## CHARGES

| Month-to-Month Charge | $250.00 | Utilities (Late Setup) | $25.00 | Lease Buy-Out | $1,275.00 |
|---|---|---|---|---|---|
| Late Payment | $150.00 | Dishonored Payment | $40.00 | Smoke/CO Alarm Tampering Charge | $200.00 |

## TOTAL MOVE-IN COSTS

| Prorated Rent and Monthly Charges | $297.50 | Total Deposits | $250.00 | Total One-Time Fees | $250.00 |
|---|---|---|---|---|---|
| TOTAL DUE ON OR BEFORE MOVE-IN | | | | | $797.50 |

| MONTHLY PAYMENTS | | DEPOSITS | | ONE-TIME FEES | |
|---|---|---|---|---|---|
| Base Rent | $1,050.00 | Security Deposit | $250.00 | Application Fee(s) Paid $60.00 | $0.00 |
| Utilities Rent | $225.00 | TOTAL DEPOSIT | $250.00 | Administrative Fee | $250.00 |
| TOTAL MONTHLY PAYMENT | $1,275.00 | | | TOTAL ONE-TIME FEES | $250.00 |

THIS RESIDENTIAL LEASE CONTRACT (this "Agreement") is made and entered into as of the 20th day of June, 2023, by and between Owner of Residential Community ("Owner") and Megan Jane Hamilton, jointly and severally (hereinafter collectively "Residents"). Owner hereby leases to Residents the premises at 3501 Pacific Hwy E #204, Fife, WA  98424 (the "Leased Premises"), located within Pinnacle Apartments (the "Residential Community"), for use exclusively as a private residence, and not for any other purpose. The Leased Premises may also include the rental of parking, storage and garage spaces, if applicable, which will be designated and included in a separate written agreement. Residents' performance of their obligations contained in this Agreement may be guaranteed by a third party. Any third-party guarantee agreements will be included with and attached to this Agreement. Owner's representatives, agents, affiliates, successors, assigns, employees, officers, and directors are hereby incorporated by reference to benefit from any and all waivers, releases, and limitations of liability made by Residents hereunder. To the extent that this Agreement is inconsistent with any applicable laws, regulations, ordinances, or codes, it shall be deemed modified to comply therewith.

1. **OCCUPANCY OF THE LEASED PREMISES.**   The Leased Premises may be occupied solely by Residents. If any person other than the Resident or Occupant occupies the Leased Premises for more than six (6) consecutive days or more than fourteen (14) total days in any twelve (12) month period, such person shall be deemed to reside in the

Initial: 

Residential Lease Contract – Washington, Certified Docs™ - Rev. 04/2023

1




Scanned with CamScanner

Pinnacle Apartments  COAST

Leased Premises in violation of this Agreement. Residents acknowledge that allowing unauthorized occupants to reside in the Leased Premises shall be deemed a material and incurable breach of this Agreement, and shall entitle Owner to serve Residents with a notice terminating the tenancy.

All changes in occupancy require Owner's prior written consent. If Owner consents to an occupancy change during the term of this Agreement, a new Residential Lease Contract or an amendment to this Agreement must be executed. Any assignment or subletting without Owner's prior written consent shall be void and may, at Owner's sole discretion, terminate this Agreement. Owner's acceptance of rent from any person, not identified as a Resident or an authorized occupant, shall be deemed to be the payment of rent on behalf of Residents and shall not constitute Owner's consent for said person to occupy or reside in the Leased Premises.

2.    **LEASE TERM.**    This Agreement will be for a period of <u>1 year and 7 days</u>, with the initial term commencing on <u>June 24, 2023</u> and expiring at <u>11:59pm</u> on <u>June 30, 2024</u> ("Initial Term"), unless sooner terminated as provided in this Agreement or as allowed by applicable law. Thereafter, this Agreement will automatically renew, under the same terms and conditions, for successive month-to-month terms, unless: a) Residents provide written notice to Owner that this Agreement will not renew at least **twenty (20)** days prior to the expiration of the Initial Term; b) Owner, under any circumstances permitted by law, provides written notice to Residents that this Agreement will not renew at least sixty (60) days (or such longer period as required by law) prior to the expiration of the Initial Term; or c) the parties execute a new Residential Lease Contract.

3.    **SECURITY DEPOSIT.**    Residents have deposited with Owner the sum of <u>$250.00</u>, the receipt of which is hereby acknowledged as a security deposit. All or a portion of the security deposit may be retained by Owner in the event Residents become liable for any of the charges listed below. The retention of the security deposit shall not limit Owner's right to proceed against Residents for claims and damages exceeding the amount of the security deposit. Residents' Security Deposit will be held at: <u>Key Bank, Seattle, WA</u>. Residents acknowledge and agree that Owner shall be entitled to and retain any interest accrued on said security deposit pursuant to RCW 59.18.270.

Owner may recover amounts owed by Residents from the security deposit for any lawful reason including, but not limited to, the following: any damages or loss caused by Residents' default or breach of this Agreement; delinquent or unpaid rent; late fees; electricity, gas, water, sewer, stormwater, or other utility charges; damages to the Leased Premises caused by simple negligence, intentional act, accident or inaction; the replacement cost of fixtures or other items contained in the Leased Premises that are damaged or destroyed; service charges; batteries for smoke detectors or other safety devices; unreturned, damaged or missing keys or entry devices; replacement light bulbs; reletting expenses; delinquent fees or unpaid deposits; the costs of rekeying or disabling unauthorized security systems and alarms; pet charges; government assessments against Owner caused by Residents, Occupants or guests; trash removal; all costs associated with illegally parked vehicles, including removal; returned check fees; removal and storage of items left in the Leased Premises; all costs, including attorneys' fees, related to eviction proceedings or the enforcement of this Agreement; and any other amounts owing from Residents to Owner. If the security deposit does not cover all of Owner's loss, Residents are liable for any unsatisfied amounts. Any security deposit will be credited to any amount owing by Residents at the end of the tenancy, including any future rent as allowed by law.

4.    **RENT.**    Residents agree to pay to Owner, as rent for the Leased Premises, the sum of <u>$1,275.00</u> per month. If Residents' tenancy initially commences after the first (1st) day of the month, Residents agree to pay <u>$297.50</u>, due <u>June 24, 2023</u>, as prorated rent for the first partial month. Except as otherwise provided, rent shall be paid in full and received in advance, with no grace period and without demand, on or before the <u>1st</u> day of each month in the form of <u>online payment, debit, personal check or certified check</u>. Rent and all other sums due to Owner will be payable to <u>PINNACLE APARTMENTS, 3501 PACIFIC HWY E, Fife, WA  98424, (425) 339-3638</u>. The usual days and hours when payments may be made personally are: <u>8am to 5pm Monday - Friday, 3501 Pacific Hwy E, Fife, WA  98424</u>. Payments made will not be held at the request of anyone - all payments made will be directly deposited. It is Residents' responsibility to be certain that each payment is actually received by Owner on or before its due date. Use of a rental payment drop box, if one is provided by Owner, is for Residents' convenience – the risk of receipt of funds by Owner when such box is used is Residents' risk, and not Owner's risk.

If in any month, rent is not paid before the <u>6th</u> day of the month, payment must be in the form of <u>certified check or money order</u>. If Owner serves Residents with a notice to pay rent or vacate the premises, which Owner may do on any date after the <u>1st</u> day of the month, any payment tendered following service of said notice must be in the form of <u>certified check or money order</u>.

4.1. **First Payment.**    Residents shall pay the first month's rent, together with all other initial payments including, but not limited to, deposits and non-refundable fees, on or before the date the Initial Term begins. In the event Residents fail to pay the first month's rent and all other initial payments, Owner shall be entitled to recover all damages suffered, including any future rent as it becomes due and other amounts subject to any mitigation of Owner's loss.

5.    **LATE PAYMENTS AND FEES.**    Owner and Residents agree that it is and will be impracticable and extremely difficult

 Initial: _____

2

 LEASE CONTRACT

Pinnacle Apartments 

to fix the actual damages suffered by Owner in the event Residents make a late payment of rent, or when Residents make a payment that is subsequently dishonored by the bank, and that the below charges represent a reasonable approximation of the damages Owner is likely to suffer from a late or dishonored payment. Owner and Residents further agree that this provision does not establish a grace period of the payment of rent, and that Owner may give Residents a written notice to pay or quit the Leased Premises in accordance with State law at any time after the payment is due. Owner shall have all remedies under the law and this Agreement in the event Resident fails to timely pay the rent or other amounts owed. At Owner's sole discretion, Owner may report any delinquent rent or other amounts owed to a credit reporting agency.

**5.1. Late Payments.**    Resident shall pay the total amount of rent owed on or before the **1st** day of the month. If Residents fail to timely pay all rent, Owner is entitled to a late fee of **$150.00** on the **6th** day of the month. Residents understand that if Residents are given a notice to pay or comply or vacate and choose to vacate the Leased Premises during the period of the notice, Residents shall remain liable for the rent through the end of the lease term or the next month in the case of a month-to-month tenancy. Any payment after the issuance of any such notice shall be by **certified check or money order** only.

**5.2. Dishonored Payments.**    Residents shall owe **$40.00** for each dishonored payment plus any applicable late fees described in this Agreement until all amounts owed are paid. In the event of a dishonored payment, Residents may, at Owner's option, be required to pay the rent and applicable late charges by **certified check or money order**. If **two (2)** or more payments submitted by Residents are, for any reason whatsoever, dishonored by the financial institution upon which it is drawn in any **twelve (12)** month period, Residents shall be required to pay all future rent and other charges by **certified check or money order** plus any and all costs required in the collection of said payments.

6.    **PAYMENTS.**    Owner is not obligated to accept any payment for rent or other charge after it is due. Except for rent, all charges are due immediately and to be paid upon Owner's demand.

7.    **RENT INCREASES AND LEASE CONTRACT CHANGES.**    Owner may notify Residents, in writing, at least sixty **(60)** days before the last day of this Agreement or before the last day of any month in a month-to-month tenancy of any increase in rent. The new rent amount shall take effect on the date stated in the notice (not earlier than the last day of the original term for periodic tenancies) without additional notice or signature of Residents. Owner may notify Residents, in writing, at least thirty **(30)** days before the last day of this Agreement or before the last day of any month in a month-to-month tenancy of any changes in terms of this Agreement other than an increase in rent. The changes to this Agreement shall take effect on the date stated in the notice (not earlier than the last day of the original term for periodic tenancies) without additional notice or signature of Residents.

8.    **COMPLIANCE WITH RULES, LAWS, AND REGULATIONS.**    Residents hereby acknowledge receipt of a copy of the Residential Community's Policies (the "Rules"), which are incorporated into and made a part of this Agreement. Residents agree to abide by said Rules in all respects. Upon thirty (30) days written notice, Owner may make changes to the Rules, which will go into effect upon completion of the then current term of this Agreement. Failure to comply with the Rules shall be deemed a breach of this Agreement.

Residents agree not to harass, annoy, or endanger any other resident or person, or create or maintain a nuisance, or disturb the peace or solitude of any other resident, or commit waste in or about the Leased Premises. Residents are responsible for the conduct of any members of their household, Occupants, or guests while present at the Residential Community. Residents further agree not to harass, verbally abuse, denigrate or otherwise disrespect Owner's employees, agents and/or contractors or interfere with Owner's business operations. Failure to abide by this policy may result in the termination of this Agreement.

Certain acts are considered to be contrary to the safety, well-being, peace, and enjoyment of the other residents of the Residential Community, and therefore, will be considered to be a breach of this Agreement. These include, but are not limited to: 1) violations of this Agreement, the Rules, or applicable fire, safety, health, or criminal laws, ordinances, or regulations, regardless of whether or where arrest or conviction occurs; 2) Residents or occupants giving incorrect or false answers in a rental application; 3) Residents or any occupants being arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for an offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, or drug paraphernalia in violation of applicable law, or any sex-related crime, including a misdemeanor; and 4) any illegal drugs or paraphernalia are found in the Leased Premises.

9.    **MULTIPLE RESIDENTS OR OCCUPANTS.**    Residents will be in material breach of this Agreement if any Resident, Occupant, or guest (whether invited or uninvited) violate any of the terms of this Agreement or the Rules. Residents are jointly and severally liable for all obligations arising under this Agreement whether or not they remain in actual possession of the Leased Premises. Notices or demands from Owner that are served upon any Resident, Occupant or guest are deemed validly served upon all Residents. Each Resident agrees and is deemed to be an agent for service of process for all other Residents in eviction proceedings. Security deposit deduction itemizations may be sent to one Resident, and



Scanned with
CamScanner

Pinnacle Apartments  COAST

shall constitute notice to all Residents. Owner may satisfy the duty to refund the security deposit by sending the total amount owed to one Resident.

**9.1. Replacements and Subletting.** Without the prior written approval of Owner, replacing Residents or subletting the Leased Premises is strictly prohibited. A replacement of Residents or sublease will be subject to Owner's policies and underwriting requirements, reimbursement of Owner's expenses in connection with the replacement or sublease, and final approval by Owner of the Residents' replacement or sublessee. Residents who are replaced or sublet the Leased Premises will continue to be liable for all of Residents' obligations under this Agreement. Replaced Residents and Sublessors relinquish their rights to a refund of the security deposit, and their right to possess or otherwise occupy the Leased Premises. Any attempt to replace any Residents or sublet the Leased Premises without Owner's prior written consent will be void. Residents shall not assign this Agreement.

**9.2. Short Term Rentals.** Residents are prohibited from offering all or part of the Leased Premises for short-term rental, such as through AirBNB, VRBO or other such sites. Use of short term rentals includes advertising, and any and all other activities involved in locating short term renters and or disseminating information of, and regarding, the possible availability of the Residential Community for any apartment for rental by short-term or transient occupants on sites such as Expedia, Priceline, hotels.com, booking.com, AirBNB or other similar locator websites, or web-based, electronic media, or private websites for individuals or companies. Any person who is not a Resident or a member of their household, who occupies any portion of the Leased Premises, for any period of time whatsoever, for any compensation or consideration whatsoever (including, without limitation, the payment of money and/or trade and/or barter of other goods, services, or property occupancy rights) is not an Occupant or guest. This constitutes attempted subletting or assignment under this Agreement.

**10. USE OF LEASED PREMISES AND COMMON AREAS.** Residents shall not do or permit anything to be done in or about the Leased Premises that will in any way obstruct or interfere with the rights of other tenants or occupants of the building or injure or annoy them or use or allow the Leased Premises to be used for any improper, unlawful, or objectionable purpose. Further, Residents shall not cause, maintain, or permit any nuisance in, on, or about the Leased Premises, or commit any waste in or on the Leased Premises, and shall promptly notify Owner in writing of any defective or potentially defective conditions, in the Leased Premises, or in the Residential Community. Residents shall not put the Leased Premises to any use that violates local zoning ordinances or any other law applicable to the Leased Premises. Residents agree to reimburse and indemnify Owner for all fines or other penalties incurred by Owner as a result of the violation of any statute, ordinance, regulation or other governmental restriction by Residents or any members of their household, Occupants, or guests. Finally, Residents agree that access or use of any amenities or facilities within the Residential Community provided by Owner, whether for cost or without cost, are not considered by either party to be a material provision of this Agreement. As such, Owner reserves the right to change or limit the operating or access hours of any such facility or amenity, or to remove or eliminate access or use of the facility or amenity at any time, and for any length of time, without prior notice to Residents. Any such action by Owner shall not serve as a basis for a claim by Residents for diminished rental value or the basis for a claim of default by Owner under the terms of this Agreement. Nothing set forth herein shall be deemed as disallowing any use of the Leased Premises that cannot legally be prohibited.

Residents further agree to the following: 1) Residents must keep the Leased Premises and areas reserved for private use clean and sanitary; 2) trash must be disposed of at least weekly in appropriate receptacles; 3) passageways may be used only for entry or exit; 4) amenity areas must be used with care in accordance with the Rules and posted signs; 5) glass is prohibited in all common areas; 6) conducting business of any kind in the Leased Premises or the Residential Community is prohibited without Owner's prior written consent—any lawful business conducted at home by computer, mail, or telephone is permissible if permitted by local zoning ordinance and customers, clients, patients, or other business associates do not come to the Leased Premises for business purposes; 7) businesses allowed in a home by state or local statute or ordinance will be permitted with proper licensing and notification provided to Owner in advance of the operation of the business; 8) Owner may exclude from the Residential Community guests or others, who in Owner's judgment, have been violating the law, violating this Agreement or any community rules, which includes anyone who is disturbing other residents, neighbors, visitors, or Owner's representatives; and 9) Owner may also exclude from any outside area or common area anyone who refuses to show identification or identify themselves as a guest, occupant or resident in the Residential Community. Any violation of these provisions shall be deemed a material and incurable breach of this Agreement and shall entitle Owner to serve Residents with notice terminating the tenancy.

**11. LEASED PREMISES AND FURNISHINGS.** Residents acknowledge that Residents have inspected the Leased Premises. Residents acknowledge that the Leased Premises are in a clean and good condition including painted surfaces, carpets, flooring, all furniture, furnishings, fixtures, equipment and appliances. It shall be conclusively presumed that said Leased Premises and all items, appliances, fixtures, smoke detectors and carbon monoxide detectors contained therein are in good working condition, unless Residents deliver a contrary statement in writing to Owner prior to or on the starting date of this Agreement. Residents agree to diligently maintain the Leased Premises, be responsible for the proper care of any and all furniture, furnishings, fixtures, appliances and equipment therein; and to keep the Leased Premises in a neat and clean condition. Residents promise to return the Leased Premises and all furniture, furnishings,

  
Scanned with CamScanner

Pinnacle Apartments 

fixtures, equipment and appliances to Owner in the same condition at the time Residents vacate the Leased Premises as when first rented, less normal wear and tear. Residents further acknowledge that the smoke detector and/or carbon monoxide detector is operable and it is the responsibility of Residents to maintain the smoke detector and/or carbon monoxide detector in accordance with law and the manufacturer's recommendations. Residents must promptly report non-functional smoke and/or carbon monoxide alarms to Owner so repairs can be made.

All appliances are installed per manufacturers' specifications and may be anchored. Residents shall not move, un-hook, or relocate any appliance connected to a gas/water source or floor drain connection at any time. Residents agree to promptly notify in writing (service request form) or by electronic notification to Owner of any defects, dilapidations, dangerous conditions, or other needed repairs as said conditions become evident. Residents agree to immediately reimburse Owner for any sums incurred by Owner to repair the Leased Premises or any item, fixture, appliance or appurtenance damaged by the misuse or neglect of Residents or any members of their household, Occupants, or guests. This Agreement may not be terminated due to interruption of any service, including necessary repairs, beyond the control of the Owner, unless otherwise required by law.

**11.1.   Smoke and Carbon Monoxide Detectors.**   Residents acknowledge that the Leased Premises is equipped with smoke detector(s) and carbon monoxide detection devices ("Detectors"). Residents will not interfere with the presence or functionality of any Detectors in the Leased Premises. Residents will report immediately and in writing any defects in the condition of any Detectors. Residents assume the responsibility for ensuring the Detectors are in operating condition at all times and for replacing batteries as needed. Owner may replace the batteries in any Detectors in the Leased Premises at any time and at cost to Residents. If Owner elects to replace Detector batteries, Owner shall give advance notice of entry, except in event of emergency. Residents will be liable for any damages that result from Residents' failure to maintain any Detector in the Leased Premises and any fines and penalties for the failure comply with RCW 43.44.110 or RCW 19.27.530.

**11.2.   Freezing Weather Conditions.**    For the purpose of preventing broken pipes and other damages, Residents agree that for the duration of any freezing weather conditions, Residents will maintain the temperature of the Leased Premises at **fifty (50)** degrees Fahrenheit, leave all closet and cupboard doors open (which allows more heat to reach pipes), and set all water faucets to drip. Residents will be liable for any damages that result from Residents' failure to perform the responsibilities listed in this Section.

12. **UTILITIES.**   Owner agrees, at Owner's expense, to furnish the following utilities to the Leased Premises: **Water, Sewer, Trash.** Residents agree to pay all charges (including utility deposits) not supplied by Owner, assessed by the utility provider (or Owner, or Owner's designated Billing Party) in connection with Residents' use of utilities during the term of this Agreement, or the period of occupancy by the Residents, whichever is longer. Residents agree to pay the utility bills for which they are responsible and ensure that utilities remain connected for the duration of the Initial Term or any renewal period. Residents shall properly use all electrical, gas and plumbing fixtures and appliances only for their intended purposes. Residents shall not install or operate any additional equipment or appliance, including, but not limited to, portable generators, additional refrigerators and freezers, a dishwasher, washing machine, clothes dryer or an air conditioning unit in the Leased Premises unless supplied by Owner or with Owner's prior written approval. Residents will be responsible for the following utilities: **Electricity and Utility/Technology Package.**

Owner may modify the method by which the utilities are furnished to the Leased Premises or billed to Residents during the term of this Agreement. In the event of interruption or failure of utility services that Owner is required to furnish, Owner shall use reasonable diligence in its efforts to restore such services. Owner shall not be liable for any damages directly or proximally caused by interruption or failure of utility service unless such interruption or failure of utility service is solely due to Owner's failure to pay to the service provider for the provision of such services to the Leased Premises.

Owner reserves the right, at any time a past due balance is owing on the utilities, to apply any and all funds received from the Residents, including funds paid as rent, first to the past due balance and then any remaining funds will be applied to Rent. Residents agree to this allocation of funds despite any limiting or restrictive endorsement contained on the payment. Further, if Residents fail to pay any utility charges that are to be paid by Residents, Owner may, at its option, pay such charges in full to retain continuing utility services and bill Residents such charges as additional rent together with the regular monthly rental payment on the **1st** day of the month next following the date of such billing. When the Residents move from the Leased Premises, the utility charges will be charged to and deducted from the security deposit. It is understood and agreed between Owner and Residents that in the event submetered or allocation Payments are not made when due, it shall be considered a default under this Agreement.

**12.1.   Connecting Utilities.**    Utilities which are individually metered must be connected in Residents' names and Residents are responsible for notifying the utility provider with any changes and move-out date so the meter can be timely read. If Residents fail to get the utilities turned on in Residents' name by the commencement date of this Agreement or cause the utilities to be transferred back into Owner's name prior to termination, surrender, or abandonment of the Leased Premises, Residents will be liable for a charge of **$25.00** plus the actual or a reasonable estimate of the cost for use of the utilities during that time. In certain areas, Residents may be able to choose between


 

Scanned with CamScanner

Pinnacle Apartments                                                    COAST

utility providers. If Residents choose to use a different provider than that of Owner, Residents must provide Owner with written notice and must pay any applicable provider fees, including but not limited to, changing the service back to Owner's name after Residents move out. Owner will attach an addendum to this Agreement if a utility is sub-metered or pro-rated by an allocation formula.

13. **DAMAGES, ALTERATIONS AND REPAIRS.**    Residents agree not to destroy, damage, deface or remove any part of the Leased Premises or Residential Community or permit any persons or animals to do so and to assume all liability for damages other than ordinary wear and tear. Residents shall make no alterations to the Leased Premises without the prior written consent of Owner. Any alteration made to the Leased Premises by Residents after that consent has been given, and any fixtures installed as a part of that work, will at Owner's option become Owner's property on the expiration or earlier termination of this Agreement, provided, however, that Owner shall have the right to require Residents to remove any fixtures at Residents' cost on termination of this Agreement. Residents shall notify Owner of any dilapidations or other defective conditions on the Leased Premises that require repairs. Residents agree not to install additional or different locks, gates or alarms on any doors or windows of the Leased Premises without written permission of Owner. If Owner approves Residents' request to install such mechanisms, Residents agree to provide Owner with a key for each lock.

**EXCEPT IN CASES OF EMERGENCIES OR FAIR HOUSING ACCOMMODATIONS, ALL NOTICES FROM RESIDENTS OR OCCUPANTS TO OWNER REGARDING REPAIRS, SERVICES, OR SECURITY MUST BE SIGNED BY RESIDENTS OR OCCUPANTS AND PROVIDED TO OWNER IN WRITTEN OR ELECTRONIC FORM ONLY, AS SPECIFIED BY OWNER.** Verbal requests from Residents, as well as written notes by Owner, Owner's employees, or agents will not be considered proper notice under this provision, and Owner's compliance with Residents' verbal requests does not constitute waiver of the strict requirements of this Section. Incidents constituting emergencies include situations where persons or property are in danger of imminent harm, such as fire, smoke, flooding water or active criminal activity. Residents must immediately notify Owner of any repairs, service issues, or security issues in the Leased Premises or at the Residential Community. Owner may terminate this Agreement upon reasonable notice to Residents if the Leased Premises are substantially damaged or the performance of services or repairs creates a danger to Residents, and Owner may remove Residents' personal property if it poses a safety or health hazard. Owner may temporarily interrupt services as needed to prevent property damage or perform repairs, which will not constitute a reduction in services entitling Residents to an abatement of rent, unless required by law.

14. **RISK OF LOSS OF RESIDENTS' PROPERTY.**    Residents shall bear the risk of loss of any and all of Residents' personal property whether located in the Leased Premises, in garage/carport, designated storage areas or anywhere within the Residential Community. Residents agree not to hold Owner, its agents and/or employees liable in any manner for or on account of any loss or damages sustained by reason of the acts or omissions of third parties, or arising from any casualty (including but not limited to fire, smoke, rain, flood, water and pipe leaks, mold, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism, unless otherwise required by law). Residents understand and agree that Residents, any members of their household, occupants, or guests are not beneficiaries of any insurance policies held by Owner or Owner's agents. Residents are required to purchase and maintain personal liability insurance for the Initial Term and any renewal periods. Failure to purchase and maintain personal liability insurance is a material breach of this Agreement.

Residents acknowledge and agree that any insurance coverage maintained by Owner is not in any way held for the protection of Residents and is not intended to benefit Residents, Occupants, guests, or invitees in any way. Residents are not to be considered an insured, implied or otherwise, of Owner or on any of Owner's insurance policies, including fire and structure, unless expressly stated within this Agreement or within the insurance policy. Residents are to remain liable for their own negligence and are solely responsible for purchasing insurance to protect their own property.

15. **ANIMALS.**    No animals are permitted without the prior written consent of Owner. Any such consent may be revoked at any time, with cause upon ten (10) days written notice or without cause upon 10 days written notice to Residents. Except to the extent written permission is given, animals may not be brought upon the Leased Premises, whether such animals belong to Residents or to any other person. The presence of any animals as to which written permission has not been given and is not currently in force, even if such animals are "just visiting," shall be deemed a material and incurable breach of this Agreement and shall be cause for the service of a notice terminating the tenancy. Service animals or companion animals are not subject to these provisions. However, Owner may require a written statement from a qualified professional verifying the need for the service or companion animal.

16. **HOLD HARMLESS FOR GUESTS.**    Residents agree to defend, protect, indemnify, and hold harmless Owner and Owner's agents against and from any and all claims, suits, liabilities, judgments, costs, demands, causes of action, and expenses, brought by Residents' Occupants, or guests or any other person in the Leased Premises with Residents' permission. If any action or proceeding is brought against Owner or Owner's agents by reason of any such claim, upon notice from Owner, Residents shall defend the same at Residents expense by counsel reasonably satisfactory to Owner.

17. **DELIVERY OF LEASED PREMISES.**    If, for any reason, Owner is unable to provide occupancy to Residents by the scheduled first day of the Initial Term, this Agreement will continue to be in effect, and Residents may elect one of the

 Initial: _____                                6                   LEASE CONTRACT


Scanned with
CamScanner

Pinnacle Apartments

following remedies: a) a prorated daily abatement of rent until the date that Owner delivers possession of the Leased Premises; or b) Residents may terminate this Agreement up until such time as Owner delivers possession. Owner will have no liability to Residents if there is a delay of possession other than to refund any amounts paid to Owner under this Agreement. Residents' failure to take occupancy of the Leased Premises due to issues of cleanliness, repairs, or services, does not constitute a failure of Owner to deliver possession of the Leased Premises.

18. **RESPONSIBILITIES OF OWNER.**   Owner will act with customary diligence, and as required by applicable law, in keeping common areas reasonably clean; maintaining fixtures and appliances; complying with applicable safety, sanitation, and fair housing laws; and making reasonable repairs, subject to payment by Residents for damages for which Residents are liable.

**18.1. Security.**   Except as otherwise required by law, Owner makes no representations or guarantees to Residents concerning the security of the Leased Premises or the Residential Community. Owner is under no obligation to Residents to provide any security measure or take any action not required by statute. The presence of courtesy patrols, patrol cars, access gates, surveillance cameras or other deterrents do not guarantee that crime can or will be prevented. All such systems are subject to personnel absenteeism, human error, mechanical malfunctions and tampering. Residents are responsible for planning and taking action with respect to the safety of Residents and their property as if such systems and deterrents did not exist. Residents agree to immediately report all suspected or actual criminal activity to the appropriate local law enforcement agencies and, after doing so, to Owner, and shall provide Owner with such law enforcement agency's incident report number upon request.

Owner has no obligation to obtain criminal background checks on any Residents and bears no responsibility or liability related to the criminal background or actions (whether past, present or future) of any person, even if Owner has actually run a criminal background check on applicants. Residents shall not rely on the fact that Owner may have run a criminal background check on Residents or any other applicant when deciding whether to enter into this Agreement. Background checks are limited to the information actually reviewed and are not a guarantee that a person with a criminal background does not reside at the Residential Community. Owner has not made and does not make any representations as to the background of any existing or future tenant and Owner is under no obligation to run background checks on any existing tenant or future applicant.

19. **ACCESS.**   Pursuant to RCW 59.18.150, Owner may enter the Leased Premises in order to: a) inspect the Leased Premises; b) make necessary or agreed repairs, alterations, or improvements; c) supply necessary or agreed services; or d) show the Leased Premises to prospective or actual purchasers, mortgagees, residents, workers, or contractors. Owner shall have the right to enter upon forty-eight (48) hours written notice, or twenty-four (24) hours written notice if entry is to show the Leased Premises to prospective or actual purchasers or residents at a specified time, and shall enter only at reasonable times. Owner may enter the Leased Premises without consent in case of emergency or abandonment. Owner may also be given right of access by court order, arbitrator or by consent of Residents. Residents acknowledge and agree that if Residents unreasonably withhold consent to Owner to enter into Leased Premises, when Owner is in compliance with statutory requirements and is entitled to access, any such denial of access shall be deemed a violation of this Lease Contract.

20. **TERMINATION, DEFAULT AND REMEDIES.**   Owner and Residents agree that all provisions, obligations, and conditions of this Agreement are reasonable and material and that a breach by Residents of any such provision, obligation, or condition constitutes a material breach thereof. Owner is entitled to all rights, remedies, and damages under this Agreement and by law, including, but not limited to, all rights and remedies for damages to the Leased Premises, cleaning charges, past and future rent due, or other amounts due under this Agreement. All rights and remedies provided in this Agreement and by law are cumulative. This Agreement shall be deemed terminated upon written notice of termination by Owner to Residents. No other action by Owner shall constitute termination, including, but not limited to: a) maintenance of the Leased Premises by Owner or on Owner's behalf; b) efforts to rent out the Leased Premises by Owner or on Owner's behalf; c) Owner's withholding of consent to assign or sublet the Leased Premises pursuant to the terms of this Agreement; d) Owner's termination of a sublet or assignment of the Leased Premises pursuant to the terms of this Agreement; or e) actions by Owner to procure the appointment of a receiver to secure Owner's interests under this Agreement. In the event of a breach by Residents, or where required by state law, Owner may provide to Residents written notice of the breach and demands for cure. Owner may terminate this Agreement if a cure is not possible or if Residents do not cure the breach within the time period provided by the notice or state law. If this Agreement is for month-to-month terms, then this Agreement may be terminated as follows: a) by Residents upon twenty (20) days written notice to Owner; or (b) by Owner, under any circumstances permitted by law, upon ninety (90) days written notice (or lesser notice if allowed by law) to Residents.

**20.1. Acceleration.**   If Residents, without Owner's consent, move out, remove property in preparation to move out, or give oral or written notice of intent to move out prior to the end of the Initial Term or renewal periods AND Residents have not paid all rent for the entire Initial Term or renewal periods, then Residents will be liable to pay rent through the remainder of the Initial Term or renewal periods. Payment will be automatically accelerated and due without

 

Scanned with CamScanner

Pinnacle Apartments 

notice or demand. Residents under a court ordered eviction or Residents who move out on demand from Owner due to a breach, will also be subject to accelerated rent payment. Accelerated rent payments are subject to Owner's obligation to mitigate. If local law prohibits the acceleration of all or a portion of future rents, this section shall be construed to allow for the maximum acceleration of the future rents as permitted under the local law.

21. **MOVE-OUT NOTICES AND PROCEDURES.**    Prior to moving out, Residents are required to provide Owner with advance written notice. The move out notice must comply with the notice provision of this Agreement and provide Residents' move-out date. Residents must obtain written acknowledgment from Owner of receipt of Residents' move-out notice. If Owner terminates this Agreement, Owner will provide Residents with the same notice unless Residents have breached the terms of this Agreement. Oral move-out notice is not an acceptable form of termination. The move-out date provided for in the notice cannot be changed without additional written agreement signed by both parties. Each Resident must provide Owner with their forwarding address in writing. A move-out notice does not release Residents from liability under the full term or any renewal terms of this Agreement except where Resident moves out pursuant to a Military Personnel Release or if Owner and Resident agree to such release in a written amendment signed by both parties. Residents may not withhold any portion or last month's rent under the assumption that the security deposit will cover rent due. Early move out by Residents may also result in reletting expenses.

Residents, Occupants, and guests must vacate the Leased Premises on or by the agreed upon move-out date, the date contained in Residents' move-out notice, or the date contained in Owner's notice to vacate. Owner may pursue action for possession for any holdover after expiration of the term of this Agreement or its termination, without the consent of Owner. Additionally, Residents will be liable for double the damages caused by their holdover, including, but not limited to, rent at the market rate and the loss of any lease signed by a new tenant who cannot take possession of the Leased Premises because of Residents' holdover.

    **21.1.  Cleaning.**    Prior to moving out, Residents are required to clean all areas of the Leased Premises, including but not limited to, living and dining rooms, kitchens, hallways, bedrooms, closets, bathrooms, floors, outdoor walkways, patios, balconies, and any leased or assigned parking or storage areas. Residents must also comply with move out and cleaning instructions provided by Owner. If, at Owner's discretion, Residents fail to adequately clean the Leased Premises, Owner reserves the right to hire a professional cleaning service and Residents will be liable for reasonable cleaning expenses. Owner may deduct the cost of carpet cleaning regardless of whether the Residents clean the carpet before delivery of possession of the Leased Premises to Owner.

22. **RESIDENTS' PERSONAL PROPERTY.**    Residents shall vacate and remove all personal property from the Leased Premises upon expiration or termination of this Agreement without further notice or demand from Owner. Owner may remove and dispose of Residents' personal property in a manner permissible by state law upon termination or expiration of this Agreement, surrender, abandonment, or court-ordered eviction of Resident. Owner may consider the Leased Premises surrendered when: a) this Agreement expires; b) Residents return keys and access devices to Owner; or c) the Residents have vacated the Leased Premises and the move-out date has passed, whichever is earlier. Owner may consider the Leased Premises abandoned when: a) the Leased Premises appears to have been vacated; b) a significant number of the Residents' personal belongings have been removed; c) utility services to the Leased Premises have been terminated or transferred; or c) Residents have informed Owner of Residents' intent to end the tenancy. Property removed or stored by Owner after Residents surrender, abandon, or are subject to a court-ordered eviction may be redeemed by Residents upon payment of all outstanding sums owed under this Agreement and applicable law.

23. **SECURITY DEPOSIT RETURN.**    Owner will mail the security deposit, less any lawful deductions, and an itemized list of amounts withheld no later than twenty-one (21) days after termination, surrender, or abandonment, unless applicable law provides otherwise. Delivery of security deposit refunds and itemized deductions to any one of multiple Residents shall constitute notice and delivery to all Residents. Residents are not entitled to a refund of any portion of the security deposit unless Owner receives proper notice of move out pursuant to this Agreement.

24. **RELEASE OF RESIDENTS.**    Unless otherwise provided for by this Agreement or by law, Residents will not be released from this Agreement.

    **24.1.  Military Personnel Release.**    A member of the armed services (or the member's spouse or dependent) may terminate this Agreement with less than twenty (20) days notice (in a month-to-month lease) in the event of permanent change of station or deployment orders that do not allow for twenty (20) days written notice, per RCW 59.18.200(1)(b), and may terminate this Agreement for a specified time (in a tenancy for a specified time) upon twenty (20) days written notice that includes a copy of the official orders or a signed letter from the member's commanding officer confirming that the criteria described in RCW 59.18.220(2) have been met, or such time as provided in the Service Member's Civil Relief Act.

25. **MISCELLANEOUS.**    This Agreement, including all applicable exhibits, schedules, addenda, or forms, sets forth all of the promises, agreements, conditions, and understandings between Owner and Residents and may not be changed or modified except by an agreement in writing signed by all parties. Residents acknowledge that all representations and

Residential Lease Contract - Washington, Certified Docs™ - Rev. 04/2023

Initial: 

6




Scanned with CamScanner

Pinnacle Apartments  COAST

statements relied upon in executing this Agreement are contained herein and that Residents in no way relied on any other statements or representations, written or oral. This Agreement and all rights of Residents arising under it are expressly agreed to be subject and subordinate to present and future recorded mortgages which are or may be placed upon the Leased Premises and all other rights afforded to the holder of any such mortgages.

**25.1. Zero Tolerance Crime Policy.** Residents, Occupants, guests, or other individuals under Residents' control: 1) shall not engage in criminal activity or engage in any act intended to facilitate criminal activity on or near the Residential Community; 2) shall not engage in drug-related criminal activity on or near the Residential Community, including but not limited to, the illegal manufacture, sale, distribution, use, or possession with the intent to manufacture, sell, distribute, or use of an illegal or controlled substance as defined in the Controlled Substance Act, 21 U.S.C. § 802; 3) shall not facilitate, use, or permit the Leased Premises to be used for criminal or drug-related criminal activity; and 4) shall not engage in any illegal activity which might negatively affect the health, safety, or welfare of Owner, Owner's agents, other residents, the Leased Premises, or the Residential Community. Owner and Residents agree that these provisions are reasonable and material and that a violation by Residents of any such provision constitutes a material breach of this Agreement and is good cause for immediate termination of tenancy.

**25.2. Satellite Dishes and Antennas.** The Federal Communications Commission states that Residents have a limited right to install a satellite dish or receiving antenna within the Leased Premises. This Agreement must be amended to incorporate requirements and restrictions prior to any installation. Residents are responsible for making sure the Leased Premises is in a location to receive the satellite signal prior to requesting permission to install. For information on requirements and restrictions, contact Owner. Resident shall not install any external media device nor climb or have others climb upon the roof.

**25.3. Bedbugs.** Bedbugs are wingless parasites which may lie dormant in cracks, crevices and personal belongings until a host is present. Residents have an affirmative duty to inspect the Leased Premises and notify Owner of the presence or infestation of insects or vermin including bedbugs within forty-eight (48) hours of the Residents taking possession of the Leased Premises. Absent this timely notice to Owner, Residents acknowledge and confirm that the Leased Premises are free of the presence or infestation of insects or vermin, including bedbugs. Residents agree to maintain the Leased Premises in a manner that prevents the occurrence of an infestation of insects and vermin including bedbugs. If Residents allow individuals or items carrying bedbugs into the Leased Premises, or have repeated infestations that cannot be traced to another source, such will be deemed damage to the Leased Premises and Residents will be responsible for the cost of treatment to the Leased Premises, personal belongings and surrounding residences as necessary to eradicate the infestation.

**25.4. Sale of Leased Premises.** In the event of a sale or pending sale of the Residential Community or in the event Owner, new owner, lender, or lender's receiver must obtain possession of the Leased Premises in order to redevelop, renovate, or demolish the Leased Premises or any portion of the Residential Community, Residents agree that Owner, new owner, lender, or lender's receiver shall have the right to terminate this Agreement upon sixty (60) days written notice, unless longer notice is required by law.

**25.5. Fair Housing.** Owner shall comply with all applicable local, state, and federal non-discrimination and fair housing laws, including laws which prohibit discrimination on the basis of race, religion, ethnic origin, national origin, color, sex, age, physical or mental disability, or family status.

**25.6. Unpaid Balances.** All unpaid balances bear twelve percent (12%) interest per year from due date, compounded annually. Additionally, if Residents fail to pay all sums due as stated in the demand letter by the deadline stated in the demand letter, Residents shall be liable to pay all collection agency fees related to the collection of the unpaid balances.

**25.7. Month-to-Month Terms.** In the event that this Agreement continues month-to-month, Residents shall pay Owner a month-to-month charge of $250.00. This charge is due to Owner every month along with the monthly rent payment, and is subject to change upon written notice to Residents. For the purposes of this Agreement, any unpaid month-to-month charges are deemed additional rent.

**25.8. Force Majeure.** To the fullest extent permitted by law, Owner shall be excused from performance or obligations under this Agreement in the event of an act of God, epidemic, war, acts of terrorism, flood, fire, tornado, hurricane, riot, or any other event beyond Owner's control.

**25.9. Cash is not acceptable as a form of payment. All monthly payments must be made by one (1) check not multiple checks. Partial payment of rent is not acceptable at any time; all payments must be made in full to include all amounts due. Post-dated or third party payments will not be accepted.**

**26. DISCLOSURE.** To the fullest extent allowed by law, Owner may provide information on Residents or Residents' rental history to business affiliates or upon reasonable request from an authorized agent of state or federal government or law enforcement agency.



Scanned with CamScanner

Pinnacle Apartments

**27. NO WAIVER.** Owner's failure on any occasion to require strict compliance with any provision of this Agreement or to exercise any rights arising hereunder shall not be deemed a waiver of Owner's right to subsequently enforce any such provision or to insist upon any such right. The fact that Owner may have accepted late payment(s) on one or more occasions shall not be deemed a waiver of Owner's right to insist upon timely payment of rent nor to exercise any remedy available for late payment of rent. Acceptance of rent following a breach of this Agreement shall not be deemed to constitute a waiver of such breach. No custom or practice which may develop between the parties in the course of the tenancy shall be construed to waive the right of Owner to enforce any provision of this Agreement.

Owner's representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Agreement or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on Owner or Owner's representatives unless in writing. Except when notice or demand is required by statute, Residents waive any notice and demand for performance from Owner of Residents' default. Written notice to or from Owner's agents, representatives, or managers constitutes notice to or from Owner. All notices must be signed.

**28. SEVERABILITY.** If a provision or paragraph of this Agreement is legally invalid, or declared by a court to be unenforceable, such provision or paragraph will be deemed deleted and the rest of this Agreement shall remain in effect. To the extent that any provision of this Agreement is in conflict with any provisions of applicable law, such provision is hereby deleted, and any provision required by applicable law which is not included in this Agreement is hereby inserted as an additional provision of this Agreement, but only to the extent required by applicable law and then only so long as the provision of the applicable law is not repealed or held invalid by a court of competent jurisdiction.

**29. ATTACHMENTS TO THE AGREEMENT.** Residents certify that he/she/they have received a copy of this Agreement and the below listed attachments to this Agreement, and understand that these attachments are part of this Agreement.

| | |
|---|---|
| Animal Addendum | Move-In/Resident File Checklist |
| Carbon Monoxide | Package Acceptance Addendum |
| Community Policies | Recycling Addendum |
| Crime/Drug Free Housing Policy | Resident Conversation Record |
| Fire Emergency Guide | Resident Personal Information Sheet |
| Fire Evacuation Plan | Resident Rental Insurance Verification |
| Infestation Responsibilities Addendum | Smoke Alarm |
| Insurance Addendum | Smoke Free Addendum |
| Key, Permits & Access Device Addendum | Standard Cleaning Charges |
| Lead-Based Paint Disclosure | Stored Product Pests |
| Lease Buy-Out Agreement | Tenant Rights and Responsibilities - WA |
| Moisture Disclosure Statement | Utilities Addendum |
| Move In - Pre-Move Out - Move Out Inspection Form | |

**30. SIGNATORIES.** This Agreement expresses the complete understanding of the parties with respect to the subject matter set forth herein and supersedes all prior proposals, agreements, representations and understandings. The undersigned Residents, whether or not in actual possession of the Leased Premises, are jointly and severally responsible for all obligations arising hereunder. This Agreement shall not be considered to be in full force and effect until signed by Owner. Owner may, without liability, refuse to enter into this Agreement and may refuse to allow Residents to occupy the Leased Premises at any time prior to signing this Agreement. Anything to the contrary in this provision notwithstanding, Residents shall be fully liable for all obligations arising hereunder, and Owner may enforce the provisions of this Agreement against Residents if, for any reason or by any means, Residents obtain occupancy to the Leased Premises before such time as this Agreement has been signed by Owner or Owner's authorized agent.

**30.1. Electronic Signatures.** The parties agree that they may enter into this transaction by electronic means; although, traditional hard copies with ink signatures may be used instead at Owner's option or if required by law. Residents agree and acknowledge that if Residents are entering into this transaction with Owner by electronic means, doing so is not conditioned on Residents' agreement to conduct the leasing transaction electronically.

INTENDING TO BE BOUND, the parties hereto have executed this Agreement as of the day and year first above written.

_____    6/20/2023
Megan Jane Hamilton *(Resident)*        Date        05:00 PM PDT

> Signed by Ashley Mysliwiec
> Wed Aug 2 2023 10:43:54 PM PDT
> Key: 63E9A0D1, IP Address: 172.56.104.71

Ashley Mysliwiec *(Owner/Agent)*        Date

Residential Lease Contract - Washington, Certified Docs™ - Rev. 04/2023

Initial: _____

LEASE CONTRACT 

Scanned with
CamScanner